IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

DONNA R.,[1]

        Plaintiff,

vs.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

Civil No. 18-cv-2010-DGW[2]

## MEMORANDUM and ORDER

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Disabled Widow's Benefits (DWB) pursuant to 42 U.S.C. § 423.

### Procedural History

Plaintiff applied for DIB and DWB in September 2014, alleging a disability onset date of July 1, 2013. After holding an evidentiary hearing, an ALJ denied the application on October 31, 2017.[3] (Tr. 15-27). The Appeals Council denied plaintiff's request for review, rendering the ALJ's decision the final agency decision. (Tr. 1). Plaintiff exhausted her administrative remedies and filed a timely complaint with this Court.

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Docs. 14, 25.

[3] The pages numbered Tr. 25 and 26 are out of order; Tr. 26 should be read before Tr. 25. The Court refers to the pages by their assigned numbers.

1

## Issue Raised by Plaintiff

Plaintiff raises the following issue:

> The ALJ's analysis of plaintiff's subjective complaints about her hands was erroneous because she relied on a misinterpretation of imaging studies and ignored probative evidence.

## Applicable Legal Standards

To qualify for DIB or DWB, a claimant must be disabled within the meaning of the applicable statutes.[4] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The plaintiff bears the burden of proof at steps 1–4. Once

---

[4] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The regulations pertaining to DWB are found at 20 C.F.R. §§ 404.335 and 404.337. The definition of disability for DWB and DIB is the same. See, 20 C.F.R. § 404.335(c), incorporating the definition of disability set forth in the DIB regulations into the DWB regulation. Most citations herein are to the DIB regulations out of convenience.

the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## **The Decision of the ALJ**

The ALJ followed the five-step analytical framework described above. She determined that plaintiff had worked part-time but had not worked continuously at the level of substantial gainful activity since the alleged onset date. Plaintiff was insured for DIB through December 31, 2020. To be eligible for DWB, she had to have been disabled before the last day of the "prescribed period;" that date was November 30, 2009.

The ALJ found that plaintiff had severe impairments of fibromyalgia, osteoarthritis, obesity, chronic fatigue syndrome, and tachycardia, which did not meet or equal a listed impairment. She also found that plaintiff's carpal tunnel syndrome was not a severe impairment but noted that any limitations it might cause had been considered in conjunction with the assessment of osteoarthritis of her hands.

The ALJ found that plaintiff had the residual functional capacity (RFC) to do work at the light exertional level, with nonexertional physical limitations consisting of (1) occasional exposure to unprotected heights and hazardous machinery; (2) no overhead reaching; and (3) only frequent, i.e., up to 2/3 of the day, handling and fingering.

Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past relevant work. However, she was not disabled because she was able to do other jobs that exist in significant numbers in the national economy.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the point raised by plaintiff.

1. **Agency Forms**

Plaintiff was born in 1964 and was 53 years old on the date of the ALJ's decision. (Tr. 459). She said she was disabled because of osteoarthritis of the spine, hands, feet, and right hip; fibromyalgia; depression; bone spur in the thoracic spine; degenerative disc disease; carpal tunnel/trigger fingers; chronic pain syndrome; sleep apnea; bilateral facet osteoarthritis; and anterolisthesis. She was 5' 1" tall and weighed 225 pounds. She was still working as a hair dresser in a salon which she owned. (Tr. 462-464). She had reduced her hours from 30 to 12 a week. (Tr. 480).

In a function report submitted in September 2014, plaintiff said that she had difficulty standing or sitting for more than 2 to 3 hours. She had back pain, muscle pain, and fatigue. She had numbness and tingling in her hands if grasping objects for more than a few minutes. She had pelvic and abdominal pain. On a typical day, she did light housework, watched TV, read, ran errands, and napped for 2 to 3 hours. (Tr. 49-493).

In May 2015, plaintiff reported that she frequently missed work because of pain, swelling, fatigue, and medication side effects. She was working 3 days a week or less for 3 to 4 hours a day. (Tr. 527).

## 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the hearing in July 2017. (Tr. 39).

Plaintiff lived with her boyfriend. (Tr. 43). She owned a hair salon in downtown St. Louis. She worked 2 days a week for 3 to 5 hours. One stylist rented space and some other employees worked one day a week. Plaintiff worked as a hairdresser and did the bookwork and payroll for the salon. (Tr. 45-46). She could not work 2 days in a row because she needed a day to recover. (Tr. 48-49).

The ALJ asked her how her physical problems affected her ability to work. She said it was mostly fatigue. The longer she stood, the more pain she had. Her hands "have really gotten bad with the arthritis and the carpal tunnel syndrome." Numbness caused her to drop combs. When applying color, she had to keep stopping and stretching out her hands. (Tr. 43-50). She was not able to hold the hair dryer and curling iron like she used to. (Tr. 51).

The arthritis in her hands was worse in her thumb and little finger on the right hand. Her thumb was enlarged because of cysts that had grown on the bone. This interfered with her ability to grasp. (Tr. 53-54).

A vocational expert (VE) also testified. The ALJ asked her a hypothetical question which corresponded to the written RFC assessment. The VE testified that this person could do jobs such as retail marker, hand packager, and laundry sorter. (Tr. 58).

### 3. Relevant Medical Records

Plaintiff began seeing Dr. Steven Lauter in June 2013. Among other problems, she complained of pain and stiffness in her hands. On exam, Dr. Lauter noted mild osteoarthritis in both hands with a full range of motion. (Tr. 650-654).

Plaintiff's hands were x-rayed in June 2013. In the right hand, there was marked joint space loss of the distal interphalangeal joint of the 5th finger and the interphalangeal joint of the thumb with sclerosis and marginal osteophyte formation. Mild areas of joint space narrowing were noted elsewhere. The impressions were (1) severe changes of arthropathy in the interphalangeal joint of the thumb and the distal interphalangeal joint of the 5th finger and a "suggestion of questionable erosive change at the distal interphalangeal joint of the 5th finger;" and (2) mild joint space narrowing of the interphalangeal joints of other fingers without periarticular osteopenia or other erosion. In the left hand, the x-rays showed osteoarthritic changes most severe of the interphalangeal joint of the thumb and the distal interphalangeal joint of the 5th finger, but also present in the interphalangeal joints of the other fingers, but no definite periarticular osteopenia or other erosion. (Tr. 660-661).

In October 2013, Dr. Lauter noted that the osteoarthritis in her hands was stable and she was to continue taking Mobic and Tylenol. (Tr. 642).

Plaintiff saw Dr. Matthew Satterly, a pain management specialist, in 2014. In May 2014, he noted that she had "numerous pain complaints." He said that there was no clear etiology for her back pain. He felt that fibromyalgia might be a contributing factor and that anxiety "plays a large part in her pain." He referred

her to Dr. Ristvedt, a clinical psychologist specializing in chronic pain.[5] (Tr. 709).

Dr. Vittal Chapa examined plaintiff at the request of the agency in February 2015. Among other problems, plaintiff said she had osteoarthritis and carpal tunnel syndrome. She said she had been scheduled for carpal tunnel surgery but did not have it. Motor strength was full. She had full hand grip and was able to do fine and gross manipulations. (Tr. 802-806).

As plaintiff admits, most of her medical treatment from 2014 to 2016 was for back and shoulder pain. See, Doc. 18, p. 10.

In March 2016, plaintiff saw Dr. Garner, her primary care physician, for a number of problems. Her complaints included mild carpal tunnel syndrome symptoms on the right which were worsening but were relieved by over-the-counter medication and rest. She said she had surgery scheduled but cancelled because she needed a hysterectomy. (Tr. 974).

Plaintiff was referred to physical therapy for her left shoulder. At the assessment in March 2016, she reported pain in the left shoulder and difficulty grasping items with the left hand. (Tr. 949). The goals of physical therapy were related to her left shoulder. (Tr. 951).

Plaintiff was seen by Dr. Atluri, a rheumatologist, twice. The first visit was in August 2016. She had been referred by her primary care doctor because of left shoulder pain and widespread osteoarthritis. The doctor noted "Deformities: OA changes of her hands." Exam showed pain and swelling in the metacarpophalangeal joints (knuckles) in the first and third fingers of both hands,

---

[5] There are no records from Dr. Ristvedt in the transcript.

but not in the interphalangeal joints. Dr. Atluri prescribed Naproxen and ordered x-rays and lab work. (Tr. 1023-1029).

X-rays were taken of plaintiff's hands and wrists in late August 2016. The specific findings as to the right hand were "The osseous structures are intact without acute fracture or dislocation. Large overhanging osteophytes are seen in the first digit interphalangeal joint where there is mild malalignment. Small periarticular cysts are seen at multiple interphalangeal joints as well as joint space narrowing and osteophytes, most significant at the fifth digit distal interphalangeal joint." The specific findings as to the left hand were "The osseous structures are intact and well aligned without acute fracture or dislocation. Large overhanging osteophytes are seen in the first digit interphalangeal joint. Small periarticular cysts or erosions are seen at multiple interphalangeal joints as well as joint space narrowing and osteophytes, most significant at the fifth digit distal interphalangeal joint." The radiologist's impression was "Osteoarthritis in both hands which is severe at the first digit interphalangeal joint and mild to moderate in the remaining interphalangeal joints." (Tr. 1060-1061).

Dr. Atluri saw plaintiff in September 2016. She noted that plaintiff indicated that Naproxen was "helping somewhat" but she continued to have low back pain. Exam showed no tenderness in her neck or back, and muscle strength was full. Regarding her hands, exam again showed pain and swelling in the metacarpophalangeal joints (knuckles) in the first and third fingers of both hands, but not in the interphalangeal joints. Dr. Atluri again noted "Deformities: OA changes of her hands." She recommended that plaintiff continue to take

9

Naproxen. (Tr. 990-1006).

In February 2017, plaintiff told Dr. Garner that Naproxen helped some but caused nausea. She complained of pain in the right buttock radiating into the thigh. There were no complaints about her hands noted. She was employed part-time as a hairdresser. (Tr. 1139-1143). In April 2017, plaintiff complained to Dr. Garner of bilateral hand pain which was getting worse. It was described as burning, numbness and tingling. She dropped things and it was impacting her work as a hairdresser. On exam, she had positive Tinel's sign and negative Phalen's sign. Dr. Garner assessed bilateral carpal tunnel syndrome and ordered further testing. (Tr. 1133-1137).

In June 2017, a nerve conduction study was consistent with severe right carpal tunnel syndrome. (Tr. 1187).

## **Analysis**

Plaintiff challenges the ALJ's finding that her subjective complaints about her hands were not supported by the record.

SSR 16-3p supersedes the previous SSR on assessing the reliability of a claimant's subjective statements. SSR 16-3p was republished in October 2017 and can be found at 2017 WL 5180304. SSR 16-3p became effective on March 28, 2016 and should be applied by the ALJ in any case decided on or after that date. 2017 WL 5180304, at *1.

SR 16-3p eliminates the use of the term "credibility," and clarifies that symptom evaluation is "not an examination of an individual's character." *Ibid.*, at *2. "Adjudicators must limit their evaluation to the individual's statements about

10

his or her symptoms and the evidence in the record that is relevant to the individual's impairments. In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation." *Ibid.*, at *11. SSR 16-3p continues to require the ALJ to consider the factors set forth in the applicable regulation, 20 C.F.R. § 404.1529. *Ibid.*, at *10.

The new SSR does not purport to change the standard for evaluating the claimant's allegations regarding her symptoms. Thus, prior Seventh Circuit precedents continue to apply.

The findings of the ALJ as to the accuracy of the plaintiff's allegations are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

The ALJ is required to give "specific reasons" for her findings in this area. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. *Ibid.* See also, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009).

The ALJ gave her reasons for discounting plaintiff's subjective allegations at

11

Tr. 26. She acknowledged that imaging studies showed arthritic changes in multiple joints but said that these changes "appear to be generally stable over time." Plaintiff argues that, on the contrary, the two sets of hand x-rays show a progression of arthritic changes between 2013 and August 2016. The 2016 x-rays were done well after the state agency consultants reviewed the file. (Tr. 62-74; 92-107). After the hearing, plaintiff requested that the ALJ obtain a review by a medical expert because of the new evidence regarding plaintiff's ability to use her hands. The ALJ denied this request because "the record contains sufficient information upon which to base a decision." (Tr. 593, 15).

According to the ALJ, the 2016 x-rays "again showed some degenerative changes in the hands and feet." (Tr. 23). She offered no detailed description of the radiology reports. The Court set forth a detailed description above.

The 2016 report describes changes that were not mentioned or were described differently in the 2013 report. The 2016 report describes "large overhanging osteophytes" in the interphalangeal joints of both thumbs and mild malalignment in the interphalangeal joint of the right thumb. In "multiple" other interphalangeal joints on both hands, there were small periarticular cysts and joint space narrowing and osteophytes, "most significant at the fifth digit distal interphalangeal joint." (Tr. 1060-1061). In contrast, the 2013 x-ray report describes "marked joint space loss of the distal interphalangeal joint of the 5th finger and the interphalangeal joint of the thumb with sclerosis and *marginal* osteophyte formation" in the right hand. (Tr. 660-661) (emphasis added). The 2013 report does not mention cysts. The 2016 report refers to "small

periarticular cysts or erosions" in multiple interphalangeal joints of the left hand, while the 2013 report stated that there was no definite periarticular osteopenia or other erosion in the left hand. Lastly, the 2013 report does not mention any malalignment in the interphalangeal joint of the right thumb.

Defendant argues that the differences in the reports were insignificant. She also argues that the absence of erosions or cysts from the 2013 reports is unimportant because erosions or cysts were not discussed under the "Impression" section of the reports and therefore "erosions or cysts were observations that underpin the notation of mild to moderate osteoarthritis in the remaining fingers." (Doc. 26, p. 10). This argument is not convincing. First, it is inaccurate in that the 2013 report explicitly states there was no definite periarticular osteopenia or other erosion in the left hand and only a suggestion of questionable erosive change at the distal interphalangeal joint of the 5th finger. Secondly, there is no support in the medical records for her conclusion that the mention of erosions or cysts served only to "underpin the notation of mild to moderate osteoarthritis in the remaining fingers." Lastly, the Commissioner is advancing a rationale not relied upon by the ALJ. The ALJ's decision cannot be upheld based upon the Commissioner's after-the-fact rationalization. *Hughes v. Astrue*, 705 F.3d 276, 279(7th Cir. 2013) ("Characteristically, and sanctionably, the government's brief violates the *Chenery* doctrine….."); *McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010) (It is "improper for an agency's lawyer to defend its decision on a ground that the agency had not relied on in its decision….").

The ALJ and the Commissioner are not medical experts qualified to interpret

radiology reports. "ALJs must rely on expert opinions instead of determining the significance of particular medical findings themselves." *Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018). In two recent cases, the Seventh Circuit has held that the ALJ erred in determining for himself the significance of MRI results, rather than seeking the opinion of a medical expert. *Akin v. Berryhill*, 887 F.3d 314, 318 (7th Cir. 2018); *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018). *McHenry* is particularly applicable. There, the ALJ erred where he "alone compared the test results with earlier treatment records to determine if McHenry's back impairment in April 2014 existed at the same level of severity during the relevant period." *McHenry*, 911 F.3d at 871.

Of course, this Court is not a medical expert qualified to determine the significance of radiology reports either, and the above discussion of the reports is not intended to suggest otherwise. Rather, the discussion illustrates that there are apparent differences between the 2013 and 2016 reports. The significance of those differences must be determined by a medical expert.

It was error for the ALJ to determine for herself that the x-ray reports show that the condition of plaintiff's hands has remained generally stable over time. Without the input of a medical expert, the ALJ's conclusion is not supported by the record. Therefore, it was error to rely on that conclusion to support the finding that plaintiff's subjective allegations were unreliable.

The second reason relied upon by the ALJ is likewise not supported by the record. She stated that the "record as a whole indicates that the claimant's pain has been responsive to treatment." But the records that she cites predate 2016

and do not refer specifically to plaintiff's hand pain. The ALJ fails to build the requisite "logical bridge" between the evidence and her conclusion where she relies on evidence that does not support the proposition for which it is cited. *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011).

The Court also agrees that the ALJ placed unwarranted emphasis on plaintiff's part-time work. The ALJ remarked that plaintiff had posted fairly significant earnings, near and sometimes above the level of substantial gainful activity. The Commissioner admits that this statement was inaccurate in that plaintiff's income included IRA distributions and therefore did not reflect an ability to work at or near the level of substantial gainful employment. Doc. 26, p. 13. Further, the ability to work part-time "is not a sufficient ground for concluding that she's not disabled." *Goins v. Colvin*, 764 F.3d 677, 679 (7th Cir. 2014).

Because of the ALJ's errors, this case must be remanded. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff was disabled during the relevant period or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:** June 28, 2019

*Donald G. Wilkerson*

**DONALD G. WILKERSON
U.S. MAGISTRATE JUDGE**